Filed 11/14/13  In re Al.E. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re A.E. et al., Persons Coming Under the Juvenile Court Law. | B249105 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>T. M.,<br><br>        Defendant and Appellant. | (Los Angeles County Super. Ct. No. CK80485) |

        APPEAL from an order of the Superior Court of Los Angeles County, Mark A. Borenstein, Judge.  Affirmed.

        Rich Pfeiffer, under appointment by the Court of Appeal, for Defendant and Appellant.

        John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Jeanette Cauble, Deputy County Counsel, for Plaintiff and Respondent.

INTRODUCTION

T. M. appeals from the order of the juvenile court terminating her parental rights to Aniya (age 7), J. (age 4), and Al. (age 3).  (Welf. & Inst. Code, § 366.26.)[1]  We affirm.[2]

FACTUAL AND PROCEDURAL BACKGROUND

1.  *The first section 300 petition in 2009*

In December 2009, when Aniya was three and J. was one year old, the Department of Children and Family Services (the Department) removed them from Twanna's custody after she was involuntarily hospitalized for psychiatric treatment.  T. blamed her hallucinations on the police.  Her arrest was a conspiracy, she asserted, because she " 'worked for a top government agency for 8 years,' and has a lot of classified information in [her] head."  She reported that the police knew where she was because the telephones were tapped and they had been watching her.  She also reported that while at the hospital, she found a pill on the ground and put it in her mouth.  After that, she " 'kept splashing my face with candy.' "  T. was diagnosed as psychotic, prescribed medication and psychiatric care, and was directed to remain sober.

The juvenile court sustained a petition declaring the children dependents (§ 300, subd. (b)).  The court granted reunification services and awarded T. monitored visits.

Twanna's visits were liberalized to unmonitored in July 2010.  By then, she was pregnant with Al.  In September 2010, the juvenile court returned the children to Twanna's care on the conditions, inter alia, that she comply with the child care and her treatment plans and cooperate with the family preservation services.

---

[1]  All further statutory references are to the Welfare and Institutions Code, unless otherwise noted.

[2]  None of the fathers of these children is a party to this appeal.

2. *New petitions in 2010*

Just over a month later, in November 2010, the Department filed a supplemental petition (§ 387) on behalf of Aniya and J., and an original petition (§ 300) on behalf of one-month-old Al. T. had disappeared with the children, and failed to take her psychotropic medication, to regularly participate in mental health services, to regularly participate in the family preservation services, or to maintain approved housing. She was disoriented and had neglected the children. The maternal grandmother reported that T. was abusing drugs. The social worker had concerns about the children's safety.

The juvenile court sustained the petitions. (§ 300, subd. (b).) It granted T. monitored visits at least twice a week and ordered reunification services for her. The Department placed infant Al. with Mrs. J. where he flourished and remained throughout the dependency. The Department placed Aniya and J. elsewhere.

Although she agreed to drug test, T. did not do so. She ran out of money and had no place to stay. She drank alcohol at least every other night even though she is taking Ativan, which should not be mixed with alcohol.

a. *the children*

Aniya was " 'easy going,' " very talkative, inquisitive, and happy. She rarely threw tantrums and responded to hugs if upset. J. was "very quiet and shy," loving, very friendly, and social. He was also aggressive. In September 2011, the Department reported that both children were receiving mental health services. Aniya was developmentally on target and not on medication. She had made progress in therapy where she addressed appropriate social interaction and adjustment to foster care, and worked to increase positive communication skills. Aniya's caregivers were concerned that the child demonstrated sexualized behavior and poor boundaries. They wanted her evaluated by a psychiatrist. J. suffered from asthma and has brachial palsy in his left arm, but was otherwise healthy. He was occasionally hyperactive and had difficulty staying on task, but his caregivers had not received any calls from the preschool about his behavior. He would need an individualized education plan (IEP) for his speech and developmental delays. He was also receiving therapy and participated well in his

3

sessions. Although he threw tantrums and was defiant when he did not get his way, his mood, assertiveness, and self-esteem issues showed improvement. Both children wanted to go home to Twanna. Al., who had been placed with Mrs. J., had bonded with her and was developing appropriately.

b. *visitation*

T. missed or cancelled without re-scheduling six of eight visits with the children between early November and mid-December 2010. By early March 2011, T. had missed full 50 percent of her visits without explanation. She had 17 monitored visits with the children in the three months between late June and the end of September 2011, but canceled or arrived too late seven other times. When she did visit, T. interacted appropriately but struggled to provide attention to all three children. She fed and changed Al., took pictures of the children, and talked to the older two about how they are doing. She sometimes read to them, played and laughed with them.

T. telephoned Aniya and J. three to four times a week to talk about their day and well-being. The children did not appear to have any behavioral issues before or after the calls. However, T. called at inappropriate times.

The juvenile court terminated reunification services at the six-month review hearing (§ 366.21, subd. (e)) in November 2011. T. did not appear at that hearing and did not challenge the order.

3. *Post-reunification*

a. *the children*

The children were physically healthy and developmentally on track in March 2012. The older children were in therapy. Aniya enjoyed music, dolls, coloring, and drawing. She was already able to dress and brush her teeth without assistance. She was "very smart" and had a "very good memory." J. liked music and playing ball. He used an inhaler. He had developmental delays, but he was receiving help with his speech and was showing significant progress in occupational therapy for his left arm.

Mrs. J., Al.'s prospective adoptive parent, was interested in adopting all three children, although she had not met the older two. To adopt them, Mrs. J. would have to

4

move to a larger home.  The Department had completed a homestudy for Mrs. J. and Al., but not for the older two children.  The court set the permanency planning hearing (§ 366.26) for September 2012 to give the Department time to conduct a homestudy for all three children.

In May 2012, the Department reported that Aniya and J. had been moved to a new foster home because their former caregivers had to leave the state.  The two children were happy, in good health, and developing appropriately, although Aniya sometimes had trouble telling the truth and J. wet the bed at night.

Aniya and J. were again moved in August 2012, this time to Mrs. A.'s house where they adjusted well and thrived.  They were developmentally on target.  Mrs. A. found Aniya to be charming, affectionate, and friendly.  The child played independently and acted older than her chronological age.  She bonded with Ms. A. whom she called " 'mommy.' "  Aniya was somewhat parentified and took care of her younger brother.  J. was happy and healthy.  He displayed some aggressiveness and threw tantrums when he did not get his way.  However, he was apologetic afterwards and was easily redirected.  J. did well with structure and, despite the tantrums, was "generally a good boy."  The children were receiving appropriate services.  J. stated he loved and wanted to stay forever with Mrs. A.  Mrs. J. remained interested in adopting all three children.

b. *visitation*

In the fall of 2011 and winter 2012, after reunification services were terminated, T. had monitored visits with the children.  When visits occurred, the children appeared to be very happy to see Twanna, who interacted appropriately with them.  She took photographs and brought them gifts.  T. telephoned the older children three to four times a week to talk about their day.  The children enjoyed listening to Twanna's voice and did not have any behavioral problems before or after contact.  The only problem surrounding the calls was that T. telephoned at inappropriate hours.

No visits with Aniya or J. occurred in December 2011 and January 2012.  T. made excuses; either she had a black eye or she was sick.  Although she checked up on the children through the social worker, it did not appear to the social worker, based on these

conversations, that T. was showing a genuine interest in making arrangements to see the children. Of the 10 scheduled visits with Al. between March and May 2012, T. missed seven. During the three visits T. did appear, Al. was uncomfortable with her and cried on and off during the entire visit.

A meeting was scheduled in January 2012 to work out the visitation problems. T. did not appear for that meeting or at the rescheduled meeting. She was hospitalized on several occasions for various reasons, including thoughts of harming herself, or because of injuries she sustained in fights. In May 2012, after Twanna's attorney indicated that T. was having trouble visiting, the juvenile court ordered the Department to facilitate visits and to do its best to provide T. visitation funds.

However, visits became so unstable that in August 2012, the Department moved for a modification of the visitation order. T. frequently disrupted the children's stability and "sabotaged" their placements because she was not in psychotherapy. T. telephoned the children while intoxicated and harassed the caregivers causing Mrs. A. to request Aniya and J. be removed. Although T. often did not appear for visits, she did appear for one in early August 2012, intoxicated and inappropriate. T. was also argumentative and aggressive with the social workers. The juvenile court denied the request to modify the visits.

Of the thirteen visits scheduled from August 2012 to November 2, 2012, two were canceled and T. was intoxicated during one. In the latter months Twanna's visits were more consistent and she behaved appropriately. Yet, claiming that J. was being sexually abused in his foster home, she threatened Ms. A. and blocked the caregiver's car. Although the Department began an investigation into Twanna's accusation, T. continued to cause commotions, harass the caregiver, and call the police during visits.

In the fall of 2012, T. entered an inpatient drug treatment program but failed to complete it and left in October 2012. The director of the program stated that T. was " 'delusional' " and " 'not rooted in reality.' " The director opined that Twanna's impulsive and reckless behaviors would put the children in "grave danger of abuse and

6

neglect, if they were returned to her care." The police found T. intoxicated in early November 2012.

T. did not visit the children at all between November 2012 and February 2013.

c. *placement with Mrs. J.*

By January 2013, Mrs. J. had moved to a larger apartment and had been approved to adopt all three children. The Department commenced Aniya's and J.'s gradual transition to Mrs. J.'s care to minimize the usual emotional upheaval associated with moving to a new home. All three children were placed with Mrs. J. by late February 2013. The Department recommended that the children be adopted.

In May 2013, the Department found that Aniya and J. were adjusting to their new home. Mrs. J. reported that, although Aniya was parentified and acted older than her chronological age, with encouragement, the child had been decreasing her parentified role and was starting to enjoy being a child. J. was displaying some aggressiveness and angry outbursts. However, after a tantrum, he was apologetic; he did well with structure and could be redirected. He would benefit from psychological services, but a court order was necessary to proceed. J. was comfortable with Mrs. J. and referred to her as "mommy."

4. *The permanent placement hearing (§ 366.26)*

T. testified she was the children's caretaker before they were detained but they had been out of her custody for two and a half years. She admitted she had not seen the children at all in January and February and had one visit in March 2013. She acknowledged her visits have been monitored.

At the close of the hearing, counsel for the children advocated for termination of parental rights, observing that Al. has bonded with his prospective adoptive parent, Mrs. J., the only caretaker he has known, and who has cared for him nearly his entire life, and the other two were very young the last time they lived with Twanna. The juvenile court found the children are adoptable and T. failed to demonstrate an exception to adoption. The court found it would be detrimental to the children to be returned to their parents and terminated Twanna's parental rights. Twanna's appeal followed.

7

CONTENTIONS

T. contends the juvenile court erred in finding the children are adoptable, and in declining to apply the parental-relationship exception to adoption. (§ 366.26, subd. (c)(1)(B)(i).)

DISCUSSION

1. *The children are adoptable*.

T. contends that the juvenile court erred in determining Aniya and J. are adoptable. She does not challenge Al.'s adoptability.

"The court may terminate parental rights only if it determines by clear and convincing evidence the minor is likely to be adopted. (§ 366.26, subd. (c)(1).) The statute requires clear and convincing evidence of the likelihood adoption will be realized within a reasonable time." (*In re R.C.* (2008) 169 Cal.App.4th 486, 491.) In determining adoptability, " 'the court focuses on *the child* -- whether his age, physical condition and emotional state make it difficult to find a person willing to adopt him.' " (*In re Josue G.* (2003) 106 Cal.App.4th 725, 733; accord, *In re Sarah M*. (1994) 22 Cal.App.4th 1642, 1649.) The juvenile court may also consider the child's progress in therapy, intellectual and academic growth, and ability to develop interpersonal relationships. (*In re Sarah M*., at p. 1651.)

On appeal, we review the evidence in a light most favorable to the juvenile court's finding of adoptability, drawing every reasonable inference and resolving all conflicts in support of the judgment. (*In re Marina S*. (2005) 132 Cal.App.4th 158, 165.) We do not reweigh the evidence. (*Ibid*.) Our task is to "determine whether there is substantial evidence from which a reasonable trier of fact could by clear and convincing evidence find a factual basis for the finding as to the child's adoptability." (*Ibid*.)

Based on their characteristics, as the Department opined, Aniya and J. are clearly adoptable. They are sufficiently young, Aniya is only seven and J. is four. Aniya is smart, independent, mature for her age, has a good memory, is affectionate, charming, helpful, considerate, friendly, and easygoing. J. is "a good boy." Both children are healthy. J. made progress in occupational therapy for the brachial palsy in his arm, he

8

was receiving speech therapy, and is otherwise physically healthy and developmentally on track and thriving. Nor is there any suggestion that these children's emotional states would make it difficult to find an adoptive parent. They are both happy. Even when he throws tantrums, J. is apologetic. He does well with structure and is easily redirected. Most important, both of these children are able to develop interpersonal relationships. They have bonded with every one of their caregivers. There is nothing about their age, physical condition, or emotional state that would make it difficult to find someone willing to adopt these children within a reasonable time. (*In re Josue G.*, *supra*, 106 Cal.App.4th at p. 733.)

T. acknowledges that the children "had several attributes that made them appropriate candidates for adoption, as well as care providers who were committed to adopting them." She nonetheless argues there is evidence the children "may not be adoptable" and, citing *In re Carl R.* (2005) 128 Cal.App.4th 1051, points to the following facts: J. was prescribed Adderall but never given the drug and he wet his bed; Aniya displayed sexualized behavior, a lack of boundaries, had trouble with telling the truth, and was parentified.

*Carl R.* has no impact on our analysis because unlike here, the child there had such pervasive disabilities that he would "always require total care." (*In re Carl R.*, *supra*, 128 Cal.App.4th at p. 1058.) Here, after June 2012, bed wetting was not mentioned, and so that fact, if it still persists, is not sufficient to overcome J.'s general adoptability. Likewise, the only reference to Aniya's sexualized behavior and boundary issues was made two years earlier and the truth-telling issue was only mentioned once, and so these passing references do not overcome Aniya's adoptability. Moreover, therapy has been effective for both children. (*In re Sarah M.*, *supra*, 22 Cal.App.4th at p. 1651.) Mrs. J. recommended counseling for J. and only needed a court order to proceed. Although a physician was willing to medicate J.'s hyperactivity, it appears that such medication was not needed as it was not being used and the caregivers received no complaints from his school. The parentified behavior Aniya had been displaying has decreased with the encouragement she receives from Mrs. J. By comparison to *Carl R.*, these children are

9

receiving all of the care and stability they need, none of which T. has given or has been capable of giving to them.

Apart from the children's characteristics which make them adoptable, both Mrs. J., and Mrs. A. are interested in adopting them. The fact that a prospective adoptive parent has expressed interest in adopting the children is evidence that the children's characteristics are not likely to dissuade others from adopting them. (*In re R.C.*, *supra*, 169 Cal.App.4th at pp. 491-492.) " 'In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent *or by some other family*.' [Citation.]" (*Id.* at p. 491, quoting from *In re Sarah M., supra,* 22 Cal.App.4th at p. 1649.)**[3]** In sum, this record contains ample evidence that Aniya's and J.'s personal characteristics make them adoptable, with the result that sufficient evidence exists supporting the juvenile court's finding by clear and convincing evidence.

2. *The parental relationship exception to adoption does not apply*.

T. contends there is no factual support for the juvenile court's finding that Twanna's progress was too little too late and that the parental bond was not sufficiently great to outweigh the benefit of permanent adoption. Thus, she argues, the order terminating her parental rights is erroneous.

At the permanency planning hearing, the juvenile court must order one of three dispositional alternatives: adoption, guardianship, or long-term foster care. (*In re S.B.*

---

**3** T. states the children had "multiple placements based on the children's behaviors" and suggests that this is evidence the children are not adoptable. T. misrepresents the record. The removal requests were made not because of the children's characteristics, but because of *Twanna's conduct* or because the caretakers were leaving California. T. similarly omits important facts when she opines that the delay in placing the two older children with Mrs. J. is evidence of placement difficulties and that the children have only been with Mrs. J. for five weeks, undermining the evidence of adoptability. The children's characteristics caused no delay. The Department wanted to introduce the children to Mrs. J.'s care gradually to minimize the stress associated with the move and to certify her new residence for the placement. The Department's prudence does not translate into the children's nonadoptability.

(2008) 164 Cal.App.4th 289, 296-297.)  The Legislature has declared a strong preference for adoption over the alternative plans if the dependent child is adoptable.  (*Id.* at p. 297.)  Once the juvenile court finds that the children are adoptable, "the court *shall* terminate parental rights unless" the court "finds a compelling reason for determining that termination would be detrimental to the child due to" one of the six delineated exceptions.  (§ 366.26, subd. (c)(1) & (c)(1)(B), italics added.)  Only if a compelling reason for applying an exception appears may the court select a plan other than adoption.

The exception to adoption on which T. relies is that found in section 366.26, subdivision (c)(1)(B)(i), the so-called parental-relationship exception.  This exception applies when the court finds that (1) "[t]he parents have maintained regular visitation and contact with the child *and* [(2)] the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i), italics added.)  As the parent, T. bears the burden to show application of this exception.  (*In re Megan S.* (2002) 104 Cal.App.4th 247, 251.)

On appeal, both the sufficiency of the evidence and the abuse of discretion standards apply.  (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315, citing *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.)  The substantial evidence standard applies to the question of whether a beneficial parental relationship exists.  (*In re Bailey J.*, at p. 1314.)  "[A] challenge to a juvenile court's finding that there is no beneficial relationship amounts to a contention that the 'undisputed facts lead to only one conclusion.' [Citation.]"  (*Ibid.*)  The abuse of discretion standard applies to the juvenile court's determination whether the parental relationship constitutes a "compelling reason for determining that termination [of parental rights] would be detrimental."  (§ 366.26, subd. (c)(1)(B).)  That assessment is "a 'quintessentially' discretionary decision, which calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption.  [Citation.]"  (*In re Bailey J.*, at p. 1315.)

Turning to the first prong of the parental-relationship exception, T. points to her testimony that she maintained regular visitation with the children, although she admitted only visiting them less than once a week over the previous six months.  Citing her own

11

testimony, T. contends she "can not [*sic*] reasonably be considered to have not visited her children due to her stay in the hospital. [Twanna] also cannot be faulted for not visiting when [the Department] cut off visits when Mother was available." Although mother claimed she did not visit in January 2013 because she was hospitalized, and in February and March 2013 because the Department foiled her visits, the juvenile court here was entitled to disbelieve Twanna's testimony and her attempts to blame everyone other than herself for the outcome of this dependency. (*In re Casey D*. (1999) 70 Cal.App.4th 38, 52.) The children were detained because of Twanna's hallucinations and psychotic episodes. As late as the fall of 2012, the director of Twanna's residential program found T. to be " '*delusional*' " and " '*not rooted in reality*.' " (Italics added.)

Turning to the whole record, it supports the juvenile court's finding, although T. did visit the children, sometimes regularly, more often than not she failed to appear for scheduled visits and did not reschedule. She missed three-quarters of her visits between early November and mid-December 2010 and half of the ensuing visits by early March 2011. She again missed many visits between late June 2011 and October 2011, and canceled or arrived too late seven more times. T. had no visits between December 2011 and May 2012 and again between November 2012 and January 2013. In mid-2012, Al. was uncomfortable with T. and cried when visiting. By August 2012, T. had become so difficult and inappropriate during the visits she had, that the Department sought a court order, albeit unsuccessfully. As for telephone contact, although she called the children more consistently, T. was frequently inappropriate. Finally, although toward the end of the dependency T. visited more consistently, she continued to behave inappropriately and her consistency came in the last months. Thus, the record simply does not reflect Twanna's contention she regularly visited the children throughout the dependency. Rather, the record supports the court's finding T. did too little too late.

Even if the juvenile court believed Twanna's testimony, T. failed to demonstrate the second prong of the parental-relationship exception to adoption, namely that the children "would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) T. argues that, "despite a lack of day-to-day contact, the minors have a loving

12

relationship and parent-child relationship with [Twanna] and would benefit from continuing the relationship."

"A beneficial relationship is one that 'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' [Citation.]" (*In re Amber M.* (2002) 103 Cal.App.4th 681, 689.) In applying the exception, courts "balance[] the strength and quality of the parent-child relationship in a tenuous placement against the security and sense of belonging that a stable family would confer on the child." (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1234-1235.) The existence of this beneficial parental relationship "is determined by '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs . . . .' [Citation.]" (*In re Jerome D.* (2000) 84 Cal.App.4th 1200, 1206.) "[I]f severing the existing parental relationship would deprive the child of 'a substantial, positive emotional attachment such that the child would be *greatly harmed*, the preference for adoption is overcome and the natural parent's rights are not terminated.' [Citation.] In other words, if an adoptable child will not suffer *great detriment* by terminating parental rights, the court must select adoption as the permanency plan. [Citation.]" (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 229, italics added.) However, "[t]he juvenile court may reject the parent's claim simply by finding that the relationship maintained during visitation does not benefit the child significantly enough to outweigh the strong preference for adoption." (*In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1350.)

Here, although when she appeared for visits or made telephone calls and was not intoxicated, T. interacted positively with the children, without more, such contact was not enough. T. points to her behavior during her visits, namely that she fed and changed Al.'s diapers, played with and read to the older children. Yet, "[i]nteraction between [a] natural parent and child will always confer some incidental benefit to the child." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) A merely friendly or familiar relationship is not enough; a parental relationship is necessary for the exception to apply. (*In re*

13

*Jasmine D*., *supra*, 78 Cal.App.4th at p. 1350.) " 'While friendships are important, a child needs at least one parent. Where a biological parent . . . is incapable of functioning in that role, the child should be given every opportunity to bond with an individual who will assume the role of a parent.' [Citation.] Thus, a child should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be beneficial to some degree but does not meet the child's need for a parent. It would make no sense to forgo adoption in order to preserve parental rights in the absence of a real parental relationship." (*Ibid.*)

Furthermore, Twanna's interactions were not always positive. Twanna's claims that the children cried at the end of visits are uncorroborated. Likewise unsupported are Twanna's claims that Aniya and J. were moved around to different placements because she telephoned them often. The children were moved because, among other things, T. called the placements excessively *at inappropriate hours* and more recently, *while intoxicated*. Although early in the dependency the older children indicated they wanted to be with Twanna, they ceased making such comments two years ago. In any event, Twanna's visitation was monitored for almost the entire dependency and so she cannot demonstrate that her bond with the children was sufficiently great to outweigh the benefit of adoption. (*In re Casey D*., *supra*, 70 Cal.App.4th at p. 51.) Meanwhile, the children have bonded with their caretaker who saw and are seeing to the children's needs for shelter, care, and security. Al. has been living with Mrs. J. almost his entire life and knows no other parent. T. has not cared for Aniya and J. for three years, i.e., more than half of their lives. "A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent. [Citation.]" (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.) Hence, "it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D*., *supra,* 78 Cal.App.4th at p. 1350.) This is not such a case.

DISPOSITION

14

The order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ALDRICH, J.

We concur:

KLEIN, P. J.

CROSKEY, J.

15